IKON OFFICE SOLUTIONS, INC.,
Gaylen McClusky and Charlie
Hollis, Appellants,

v.

Steven G. EIFERT, Appellee,

and

In Re Ikon Office Solutions, Inc.,
Gaylen McClusky and Charlie
Hollis, Relators.

Nos. 14–98–01337–CV, 14–98–01424–CV.

Court of Appeals of Texas,
Houston (14th Dist.).

Sept. 16, 1999.

Joy M. Soloway, Houston, for appellants.

Eugene B. Wilshire, Jr., Patrick J. Dyer, Houston, for appellees.

Panel consists of Justices YATES, FOWLER and FROST.

## OPINION

LESLIE BROCK YATES, Justice.

This is a consolidated interlocutory appeal and petition for writ of mandamus arising from an order denying a motion to compel arbitration brought by appellants/relators, IKON Office Solutions, Inc.("IKON"), Gaylen McClusky, and Charlie Hollis. *See* Tex. Civ. Prac. & Rem. Code Ann. § 171.098a(1) (Vernon Supp. 1999); *see also Jack. B. Anglin Co. v. Tipps*, 842 S.W.2d 266, 272 (Tex.1992). At issue is whether contract and tort claims asserted by appellee/real party in interest, Steven G. Eifert, are covered by the arbitration provision in the parties' sale agreement. Because we conclude the arbitration provision is limited and does not cover Eifert's claims, we affirm the trial court's judgment and deny the petition for writ of mandamus.

## FACTUAL AND PROCEDURAL BACKGROUND

Eifert is the former owner of nearly 97% of the outstanding shares of Global Services, Inc. ("Global"), a distributor of office products. In May 1996, Eifert sold Global to Alco Standard Corporation, now IKON, a major distributor of office supplies. The sale is documented by a Plan and Agreement of Reorganization ("the Acquisition Agreement") between IKON and Global's two shareholders, Eifert and Dana Davis. During negotiations, Eifert made three demands: (1) that Eifert be given a "meaningful" position in IKON after acquisition, (2) that Global continue as a distinct, independent operating entity for more than two years, and (3) that Eifert remain as CEO of Global with full control over executive employment. These demands, along with a promise to give Global the rights to market IKON's exclusive product line of Ocè copiers and systems printers, were

made terms of an Employment and Non–Competition Agreement ("the Employment Agreement") between IKON and Eifert. The Employment Agreement specifically contemplates the "concurrent" execution of the Acquisition Agreement and was attached to the Acquisition Agreement as Exhibit E.[1] That exhibit, as well as other exhibits and schedules were incorporated by reference and made a part of the Acquisition Agreement. According to its terms, the Acquisition Agreement constituted the entire agreement of the parties.

After the sale, Global incurred losses. Eifert alleges that these losses were caused as a result of a "spin-off" of one of IKON's operating entities, which IKON had previously assured would not cause a problem. He also alleges there was a conspiracy between IKON's Central Division President, Gaylen McClusky, and the President of IKON Houston, Charlie Hollis, to get rid of Global as a distinct entity and to interfere with Eifert's contractual relationship with IKON. Eifert alleges that IKON, led by McClusky and Hollis, disparaged Global in the market place, denied Global access to the Ocè product line, and delayed Eifert's appointment as CEO of IKON's Texas operations. At a November 1996 meeting among IKON and Global executives to discuss Global's situation, McClusky announced plans to cease Global's operations as an independent entity. Accordingly, IKON never made Eifert CEO of IKON's Texas operations and never gave Global the opportunity to market the Ocè product line. Eifert ultimately resigned.

On December 19, 1997, Eifert filed suit against IKON, McClusky and Hollis for breach of contract, fraud, tortious interference and conspiracy. Specifically, Eifert alleged that IKON breached the Employment Agreement and fraudulently induced him to sell his company for "far less than its actual value." Eifert also alleged that McCluskey and Hollis tortiously interfered with the Employment Agreement and conspired to commit fraud. Eifert subsequently filed a first amended petition, adding a claim for declaratory relief that the covenant not to compete contained in the Employment Agreement was unenforceable. In response to Eifert's claims, the defendants filed a general denial. In the spring of 1998, the trial court set the case for trial on January 18, 1999. During that spring and fall, the parties engaged in limited discovery. On September 3, 1998, ten months after Eifert had filed suit and four months before trial, the defendants filed a motion to compel arbitration asserting that all of Eifert's claims were based on the termination of his employment and thus, were covered by the arbitration provision contained in the Employment Agreement. The defendants attached a copy of that agreement to their motion. Paragraph 7 of the Employment Agreement, entitled Arbitration of Disputes, provides:

*In the event Employee's employment is terminated, and Employee contends that such termination was wrongful or otherwise in violation of his rights or privileges, express or implied, whether founded in fact or in law, or any other rights or privileges, or was in violation of any express or implied condition, term, or covenant, whether founded in law or in fact, including but not limited to the covenant of good faith and fair dealing, or otherwise in violation of law, Employee and [IKON] agree to submit*

1. Both agreements were executed at approximately the same time. The Employment Agreement states on the first page it is "made as of the 31st day of May, 1996." The signature page then states that "the parties hereto have executed this Agreement as of day and year first above written." Although the Acquisition Agreement states on the first page that it is "dated the 10th day of May, 1996," there is the notation, "5/31/96 final agreement" written and initialed on the same page, along with the date, "5/30/96" typed in the corner. Likewise, the signature page of the Acquisition Agreement states that "the parties hereto have caused this Agreement to been executed and delivered as of the date and year first above written."

*the above-described disputed matter to binding arbitration in Houston, Texas in accordance with the rules of the American Arbitration Association.* Employee and [IKON] further expressly agree that in any such arbitration, the maximum remedy which may be awarded by the arbitrator(s) shall be limited to any unfulfilled Base Salary remaining in the employment period, and Employee agrees that he shall not be entitled to any other remedy at law or in equity, including but not limited to general damages, punitive damages and/or injunctive relief.

On September 16, 1998, Eifert filed a second amended petition. In this pleading, Eifert continued to maintain that the defendants fraudulently induced him to sell his company for less than its true value. Eifert, however, added factual allegations concerning representations made about "the value of IKON stock being paid to [him] for his Global stock." He also alleged that the "critical promises and representations made to [him] to induce the sale were incorporated into the Acquisition Agreement." Thus, Eifert deleted references to the Employment Agreement and instead, referred to the Acquisition Agreement.[2] In addition, Eifert added two more counts of fraud, including statutory fraud in a stock transaction, and specifically alleged breach of the Acquisition Agreement.

On the same day that he filed his second amended petition, Eifert filed a response to the motion to compel arbitration, asserting that his claims were not for wrongful termination under the Employment Agreement, but were based solely on the alleged fraudulent sale of his company under the Acquisition Agreement. According to Eifert, there was no agreement to arbitrate claims arising from the Acquisition Agreement. Eifert also asserted that McClusky and Hollis could not individually enforce the arbitration provision in question because they were not parties to either agreement. He further asserted that IKON had waived arbitration by participating in discovery. Eifert attached the Acquisition Agreement, his second amended petition, his own affidavit and the affidavit of his attorney. Eifert later filed a supplemental response that included affidavits from two experts and the attorney who handled the merger for Eifert. The defendants filed a response reasserting that Eifert's claims were subject to arbitration under the Employment Agreement.

On October 26, 1998, the trial court held a hearing and orally denied the defendants' motion to compel arbitration. On November 11, 1998, the trial court signed the written order. Five days later, the defendants filed their notice of accelerated appeal. *See* Tex.R.App. P. 26.1(b), 28; *see also* Tex. Civ. Prac. & Rem.Code Ann. § 171.098a(1). On December 22, 1998, as an alternative to their appeal, the defendants filed their petition for writ of mandamus. On February 11, 1999, we consolidated the two proceedings and stayed a final trial on the merits pending a final decision on both the appeal and mandamus. *See In re Valero Energy Corp.,* 968 S.W.2d 916, 916–17 (Tex.1998). On April 19, 1999, pursuant to the request of appellants/relators, we abated both proceedings and postponed oral argument to allow the newly appointed judge of the 215th District Court the opportunity to reconsider

---

**2.** Appellants point out that Eifert's original and first amended petitions did not mention the Acquisition Agreement by name. However, a review of both petitions shows that Eifert alleged wrongdoing with respect to both the Acquisition and Employment Agreements. For example, Eifert alleged that McClusky and Hollis conspired "to frustrate and interfere with Eifert's employment contract," and that "IKON materially breached its employ-ment contract with Eifert." Eifert also alleged that the conduct of McClusky and Eifert was "in direct conflict with IKON's contractual agreements with Eifert," that McClusky's decision to cease Global's operations was "a substantial breach of the IKON/Global *merger* agreement," and that "IKON had no intention of honoring material contractual agreements with him."

the court's prior order denying the motion to compel arbitration. *See* Tex.R.App. P. 7.2(b). On May 13, 1999, the new trial judge denied the defendants' motion for reconsideration.

## INTERLOCUTORY APPEAL (TEXAS ACT)

### Standard of Review

■ In determining whether to compel arbitration, two issues must be decided: (1) whether a valid, enforceable arbitration exists, and if so, (2) whether the claims asserted fall within the scope of the agreement. *See Leander Cut Stone Co., Inc. v. Brazos Masonry, Inc.*, 987 S.W.2d 638, 640 (Tex.App.—Waco 1999, no pet.); *see also Dallas Cardiology Associates, P.A. v. Mallick*, 978 S.W.2d 209, 212 (Tex. App.—Texarkana 1998, pet. denied). A court has no discretion and must compel arbitration if the answer to both questions is affirmative. *See Dallas Cardiology*, 978 S.W.2d at 212. The trial court may summarily decide whether to compel arbitration on the basis of affidavits, pleadings, discovery and stipulations. *See Jack B. Anglin*, 842 S.W.2d at 269. The trial court must conduct an evidentiary hearing, however, when there are disputed material facts. *See id.*

■ In reviewing factual questions concerning an order denying arbitration, the appellate courts use a "no evidence" standard. *See Fridl v. Cook*, 908 S.W.2d 507 (Tex.App.—El Paso 1995, writ dism'd w.o.j.). Legal conclusions, however, are reviewed *de novo*. *See Fridl*, 908 S.W.2d at 511; *see also Certain Underwriters at Lloyds of London v. Celebrity*, Inc., 950 S.W.2d 375, 377 (Tex.App.—Tyler), *writ dism'd .w.o.j.*, 988 S.W.2d 731 (Tex.1998). Because Texas public policy favors arbitration, every reasonable presumption must be decided in favor of arbitration. *See Nationwide Of Bryan, Inc. v. Dyer*, 969 S.W.2d 518, 520 (Tex.App.—Austin 1998, no pet.); *see also Pepe Int'l Dev. Co. v. Pub Brewing Co.*, 915 S.W.2d 925, 930

(Tex.App.-Houston [1st Dist] 1996, no writ).

### The Agreement to Arbitrate

■ In arguing against arbitration, Eifert contends his claims are based solely on the fraudulent sale of his company under the Acquisition Agreement, not the termination of his employment under the Employment Agreement. Thus, because the Acquisition Agreement does not contain an arbitration provision, Eifert contends there was no agreement to arbitrate. Eifert's attempt to distinguish the two agreements is misplaced. In this case, there is but one agreement: the Acquisition Agreement. Under general principles of contract law, separate agreements executed contemporaneously by the same parties, for the same purposes, as part of the same transaction, are to be construed together. *See Neal v. Hardee's Food Systems, Inc.*, 918 F.2d 34, 37 (5th Cir.1990). In order for a document to be considered part of a signed contract it must be signed and referred to in the signed contract. *See Cavazos v. Cavazos*, 941 S.W.2d 211, 214 (Tex.App.—Corpus Christi 1996, writ denied). As we previously noted, both the Acquisition and Employment Agreements were signed at approximately the same time. The Employment Agreement specifically contemplates the contemporaneous execution of the Acquisition Agreement. The Acquisition Agreement, in turn, refers directly to the Employment Agreement as Exhibit E and states that all attached exhibits and schedules are incorporated by reference and expressly made part of the Acquisition Agreement. Thus, the Acquisition Agreement, by its express terms, includes the Employment Agreement and its arbitration provision.

Whether the parties have agreed to arbitrate is a question of fact to be summarily determined by the trial court. *See* Tex. Civ. Prac. & Rem.Code Ann. § 171.021(b); *see also Weber v. Hall*, 929 S.W.2d 138, 141 (Tex.App.—Houston [14th Dist.] 1996, orig. proceeding). Although case law con-

flicts regarding the proper standard of review of this fact issue,[3] it makes no difference under the facts of this case because the Acquisition Agreement clearly contains an agreement to arbitrate.[4] Thus, we are left to decide only the scope of that agreement.

### The Scope of the Arbitration Agreement

 Once the existence of an arbitration agreement is shown, the party seeking to avoid the effects of the agreement may do so by establishing that the dispute is not within the terms of the agreement. *See D. Wilson Constr.,* 988 S.W.2d at 394. Whether the parties' agreement imposes a duty to arbitrate a particular dispute is a matter of contract interpretation and a question of law for the court. *See Kline v. O'Quinn,* 874 S.W.2d 776, 782 (Tex.App.—Houston [14th Dist.] 1994, writ denied), *cert denied,* 515 U.S. 1142, 115 S.Ct. 2579, 132 L.Ed.2d 829 (1995); *see also Leander Cut Stone,* 987 S.W.2d at 640. That is, the language of the contract will be enforced according to its plain meaning unless such a reading would defeat the intention of the parties. *See D. Wilson Constr.,* 988 S.W.2d at 393. Because the issue involves the trial court's legal interpretation of the arbitration clause, *de novo* review is appropriate. *See id.; Nationwide,* 969 S.W.2d at 520; *Certain Underwriters,* 950 S.W.2d at 377.

 A plain reading of the arbitration provision at issue reflects that it is limited in scope. It requires the parties to arbitrate a dispute arising out of the termination of Eifert's employment in which Eifert claims that his termination is "wrongful or otherwise in violation of his rights and privileges" or in violation "of any condition, term, or covenant." Be-

cause it refers to a violation of express or implied rights, privileges, or covenants, founded either in law or in fact, the arbitration provision also covers both tort and contract claims. The arbitration provision, however, limits Eifert's remedy to the unpaid base salary remaining in the employment period. We do not believe the parties would have contemplated such a limited remedy if, as appellants argue, the arbitration provision is triggered merely by a claim that "rights and privileges" are violated, regardless of whether those "rights and privileges" relate to the termination of employment. Such a broad interpretation is clearly contrary to the plain meaning of the provision. While both tort and contract claims based on the termination of employment are within the scope of the arbitration provision, the question is whether Eifert's claims are based on the termination of his employment.

In determining whether a claim falls within the scope of an arbitration agreement, Texas courts follow federal law and focus on the factual allegations of the complaint rather than the legal cause of action asserted. *See Prudential Securities, Inc. v. Marshall,* 909 S.W.2d 896, 900 (Tex. 1995) (citing *Genesco, Inc. v. T. Kakiuchi & Co., Ltd.,* 815 F.2d 840, 846 (2nd Cir. 1987)). Eifert points out that he was not terminated, but that he resigned. Appellants do not dispute that Eifert resigned, but claim that "termination" within the meaning of the Employment Agreement includes "voluntary resignation." Appellants rely on section 4 of the Employment Agreement, entitled Termination of Employee, which provides in pertinent part:

---

**3.** *See D. Wilson Constr. Co. v. Cris Equip. Co., Inc.,* 988 S.W.2d 388 (Tex.App.—Corpus Christi 1999, n. pet. h.) (applying the "no evidence" standard); *Belmont Constructors, Inc. v. Lyondell Petrochemical Co.,* 896 S.W.2d 352, 356 (Tex.App.—Houston [1st Dist.] 1995, no writ) (same); *but see Hardin Constr. Group, Inc. v. Strictly Painting, Inc.,* 945 S.W.2d 308, 311–12 (Tex.App.—San An-

tonio 1997, orig. proceeding) (applying the "abuse of discretion" standard).

**4.** There is no claim that the agreement is unconscionable or otherwise revocable. *See* TEX. CIV. PRAC. & REM.CODE ANN. §§ 171.001(b), 171.022 (Vernon Supp.1999).

Notwithstanding any other provision of this Agreement, [IKON] may terminate this Agreement (and any future obligations) in the event of *voluntary resignation* on the part of Employee or for cause.... In the event Employee is terminated for reasons other than *voluntary resignation* or for cause, the parties agree that [IKON's] sole and exclusive responsibility and obligation shall be to continue to make regular payments to Employee for the remainder of the Agreement....

This provision primarily addresses IKON's right to terminate the Employment Agreement in the event that Eifert voluntarily resigns, or for cause based on Eifert engaging in certain prohibited conduct defined in the agreement. While this provision refers to "termination for reasons other than voluntary resignation or for cause," it does not expressly define "termination" to include resignation. Even if that were the case, Eifert's claims are not based on the termination of his employment; Eifert's claims are based on the fraudulent sale of his company. Specifically, Eifert alleges that he was fraudulently induced into selling his company for less than its true value because of misrepresentations made during the negotiations and the subsequent breach of the Acquisition Agreement.[5] Furthermore, Eifert does not seek damages related to employment, such as unpaid salary; he seeks damages for the amount he alleges he was under compensated for the sale of Global. Thus, this case is not based on a dispute over the termination of Eifert's employment.

Appellants nevertheless contend that the promises made to Eifert were "rights and privileges" that existed solely by virtue of the Employment Agreement. Because Eifert alleges that he resigned as a result of a violation of these "rights and privileges," and because the Employment Agreement was incorporated into the Acquisition Agreement, appellants contend that Eifert cannot avoid arbitration. In support of their argument, appellants rely on *Neal v. Hardee's Food Systems, Inc.* 918 F.2d 34 (5th Cir.1990) and *B.F. Goodrich Co. v. McCorkle,* 865 S.W.2d 618, 621 (Tex. App.—Houston [14th Dist.] 1993 orig. proceeding). In each of these cases, the parties' transaction was evidenced by at least two agreements, with only one agreement containing a broad arbitration clause. *See Neal,* 918 F.2d. at 36; *see also B.F. Goodrich,* 865 S.W.2d at 620. The party opposing arbitration argued that the subject matter of its claims involved the agreement that did not contain the arbitration clause and that each agreement should be viewed separately. *See id.* In each case, the court found the agreements comprised one transaction and thus, were to be construed together under general principles of contract law. *See id.* at 37; *see also id.* at 620–21. More importantly, because the parties chose to include a broad arbitration clause, the court held that the parties intended the clause to reach all aspects of their relationship and that the claims in issue were subject to arbitration.[6] *See id.*

This case is similar to both *Neal* and *B.F. Goodrich* in the sense that the parties executed the Acquisition and Employment Agreements contemporaneously as part of the same transaction. It is also similar in that the party opposing arbitration claims that suit was based on breach of the

---

**5.** Appellants argue that Eifert's fraudulent inducement claim does not defeat arbitration because it relates to the parties' entire transaction, not just the arbitration provision. *See The Babcock & Wilcox Co. v. PMAC, Ltd.,* 863 S.W.2d 225, (Tex.App.—Houston [14th Dist.] 1993, writ denied). While this is a correct statement of the law, it is significant only if Eifert's claims are covered by the arbitration provision.

**6.** In *Neal,* the arbitration clause provided that "any and all disputes between them, and any claims by either party" shall be determined by arbitration. *See Neal,* 918 F.2d at 35. In *B.F. Goodrich,* the parties agreed to arbitrate "any dispute or disagreement." *See B.F. Goodrich,* 865 S.W.2d at 620.

agreement not containing an arbitration clause. This case is distinguishable, however, in one critical respect. Unlike the broad arbitration clauses in *Neal* and *B.F. Goodrich* that required arbitration of "any dispute" between the parties, the narrow arbitration clause in this case covers only disputes related to the termination of employment. Eifert's claims are not based on the termination of his employment. Therefore, they are not covered by the arbitration provision.

Because Eifert's claims are not covered by the arbitration provision, we need not decide whether both the tort and contract claims are subject to arbitration. For the same reason, we need not address the enforceability issues raised by Eifert. Accordingly, the trial court correctly denied the motion to compel arbitration and we affirm the trial court's judgment.

## MANDAMUS (FEDERAL ACT)

The result is no different under the Federal Arbitration Act. Generally, mandamus relief is available if the trial court violates a duty imposed by law or clearly abuses its discretion, either in resolving factual issues or in determining legal issues, when there is no adequate remedy at law. *See Walker v. Packer*, 827 S.W.2d 833, 839–40 (Tex.1992). A party erroneously denied the right to arbitration under the Federal Act has no adequate remedy on appeal and mandamus relief is appropriate. *See In re Oakwood Mobile Homes*, 987 S.W.2d 571, at 574–75, 42 Tex. Sup.Ct. J. 377, at 379 (1999).

### Interstate Commerce

The Federal Arbitration Act "applies to all suits in state and federal court when the dispute concerns 'a contract evidencing a transaction involving commerce.'" *See Jack B. Anglin*, 842 S.W.2d at 269–70. A transaction "involves commerce" if it "substantially affects interstate commerce." *See L & L Kempwood Assoc., L.P. v. Omega Builders, Inc.*, 972 S.W.2d 819, 821–22 (Tex.App.—Corpus Christi 1998, no pet.) (citing *U.S. v. Lopez*, 514 U.S. 549, 559, 115 S.Ct. 1624, 1630, 131 L.Ed.2d 626 (1995); *but see Palm Harbor Homes, Inc. v. McCoy*, 944 S.W.2d 716, 719 (Tex.App.—Fort Worth 1997, orig. proceeding) (holding that a transaction involves interstate commerce only if it affects interstate commerce "in fact"); *BWI Companies, Inc. v. Beck*, 910 S.W.2d 620, 622 (Tex.App.—Austin 1995, orig. proceeding [leave denied]) (stating that "commerce" under the Federal Act should be broadly construed and that the Federal Act is implicated if the transaction at issue relates to interstate commerce). Where, as in this case, the arbitration agreement is silent as to whether the Federal Act or Texas Act applies, the question of whether the parties' transaction affects interstate commerce is one of fact. *See e.g., Stewart Title Guar. v. Mack*, 945 S.W.2d 330, 333 (Tex.App.—Houston [1 st Dist.] 1997, orig. proceeding [leave denied]); *see also e.g., Belmont Constructors Inc. v. Lyondell Petrochemical Co.*, 896 S.W.2d 352, 356 (Tex. App.—Houston [1 st Dist.] 1995, no writ). The burden is on the party seeking to compel arbitration to establish its right to arbitrate under the Federal Arbitration Act. *See EZ Pawn Corp. v. Mancias*, 934 S.W.2d 87, 91 (Tex.1996); *see also Stewart Title*, 945 S.W.2d at 333.

Relators make no attempt to prove that the present dispute concerns a transaction involving interstate commerce. Relators did not argue or present evidence on that issue in the trial court, nor have they adequately addressed the issue in this court. On that basis alone, relators have failed to establish their right to arbitrate under the Federal Arbitration Act. Even assuming the Federal Act applies, as discussed below, Eifert's claims are not covered by the arbitration provision.

### The Scope of the Arbitration Agreement

When a party asserts a right to arbitration under the Federal Act, the question of whether a dispute is subject to arbitration is determined under federal

law. *See Prudential Securities*, 909 S.W.2d at 899. Under federal law, whether a claim falls within the scope of an arbitration agreement depends on the factual allegations of the complaint rather than the legal cause of action asserted. *See id.; see also Prudential–Bache Securities, Inc. v. Garza*, 848 S.W.2d 803, 807 (Tex.App.—Corpus Christi 1993, orig. proceeding). Any doubts as to whether a claim falls within the scope of the agreement must be resolved in favor of arbitration. *See Prudential Securities*, 909 S.W.2d at 899. The federal policy in favor of enforcing arbitration agreements is so compelling that a court should not deny arbitration *"unless it can be said with positive assurance* that an arbitration clause is *not* susceptible of an interpretation which would cover the dispute in issue." *See id.* (emphasis in the original). However, the strong federal policy favoring arbitration cannot serve to stretch a contractual clause beyond the scope intended by the parties or allow modification of the plain and ambiguous provisions of an agreement. *See Belmont Constructors*, 896 S.W.2d at 356.

As we previously concluded, a plain reading of the arbitration provision reflects that it covers only a dispute involving the termination of employment. Because Eifert's claims are not based on the termination of employment, it can be stated with "positive assurance" that the arbitration provision does not cover those claims. Therefore, the trial court did not commit a clear abuse of discretion in denying relators' motion to compel arbitration. Accordingly, we deny the petition for writ of mandamus.